761 A.2d 355

**Bernice C. STARKE**

v.

**Albert Edward STARKE.**

**No. 2134, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Nov. 3, 2000.

David C. Slade, Bowie, for appellant.

W. Ray Ford, Camp Springs (Perry J. Becker and Northrop, Walsh, Becker, Colaresi & Spears, Bowie, on the brief), for appellee.

Argued before MURPHY, Chief Judge, MOYLAN, and LAWRENCE R. DANIELS (Specially Assigned), JJ.

MOYLAN, Judge.

It is a cliché that the law is a thing of never-ending fascination. This apparently routine appeal confirms the truth underlying that cliché, as we are called upon, for what seems

the thousandth time, to make an apparently simple "clear error" analysis of a trial judge's verdict. The never-ending fascination emerges with the realization that we are looking for clear error in a mirror, where left is right and up is down and everything moves in the opposite direction. We are asked to do a familiar thing in what turns out to be an unfamiliar way.

The thrust of the appeal is that a trial judge, in his fact-finding capacity, was clearly erroneous. He is charged, however, with being clearly erroneous not in something that he found but in something that he did not find. Although the distinction has suffered long neglect, those two decisional phenomena are not the same. We do not, and cannot, assess the propriety of **what is not done** in the same way that we assess the propriety of **what is done.**

## THE TRUE ISSUE

The appellant, Bernice C. Starke, challenges the verdict entered in favor of the appellee, Albert Edward Starke, by Judge Thomas P. Smith in the Circuit Court for Prince George's County. The appellant presents the following issues for our consideration:

1. When title to the appellant's real property was changed from sole ownership by the appellant to joint ownership by the appellant and the appellee, did the trial court err in (a) failing to order a constructive trust or (b) failing to find constructive fraud?

2. Did the trial court err in holding that title to the real property should not be quieted to the appellant's benefit?

Such a framing of the issues, however, hopelessly obscures the single, apparently simple, but ultimately profound issue that is dispositive of everything else. In the way the case now plays out before us, although not in the way it played out before the trial court, the controlling threshold question is whether there existed a confidential relationship between an

elderly mother, who signed a deed, and her son, who received a benefit from the deed.

Although we may have to do a little procedural house cleaning at the end of the opinion, all of the legal results with respect to constructive fraud, constructive trust, and the quieting of title follow, essentially automatically, from the answer to that ultimately controlling threshold question. Judge Smith did not find that any such confidential relationship existed. The appellant's case rises or falls with her claim that Judge Smith was clearly erroneous in not so finding.

## "CLEAR ERROR" ANALYSIS APPLIES TO VERDICTS AND NOT TO INTERMEDIATE FACT FINDING

The appellant's central claim is that Judge Smith was clearly erroneous for failing to find the existence of a confidential relationship. In her appellate brief, she frames that contention unequivocally:

Whether a "confidential relationship" existed is a question of fact. In a non-jury trial, an appellate court will not set aside a judgment of the trial court on the evidence unless clearly erroneous. Rule 8–131(c). *Appellant respectfully submits that*, on the basis of the record, even when taking the facts in the best light of the Appellee, *the trial court's ruling that no "confidential relationship" [existed] was clearly erroneous.*

(Emphasis supplied).

In that contention, the appellant relies on Md. Rule 8–131(c). That Rule, however, has no bearing on the contention. Rule 8–131(c) provides:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. *It will not set aside the judgment of the trial court on the evidence unless clearly erroneous,* and will give due regard to the opportunity of the trial court to judge the credibility of witnesses.

(Emphasis supplied).

Rule 8–131(c) does not apply to evidentiary rulings, even rulings that have a critical influence on the outcome of

the case. Neither does Rule 8–131(c) apply to ancillary or intermediate findings of fact (or non-findings of fact), even those that might control, as in this case, whether a presumption of undue influence arising out of a confidential relationship should arise.

Rule 8–131(c) applies only to **verdicts,** conferring on an appellate court the authority to **review a verdict on the evidence.** Historically, no such authority existed in either court trials or jury trials. In a jury trial, however, it effectively existed because a trial judge's legal decision as to whether the evidence was sufficient to permit the case to be submitted to the jury was reviewable as a matter of law. No such review of the sufficiency of the evidence was traditionally available in a court trial, however, because a judge, in his capacity as a legal referee, was not required to make a legal ruling before submitting the case to himself, in his capacity as a fact finder.

The procedural formality that attends the passing of a case from a legal-referee judge to a fact-finding jury is not present when a judge alone, playing two distinct roles, passes the case from the left hemisphere of his brain, where he "thinks" as a legal referee, to the right hemisphere of his brain, where he "feels" as a fact finder. No legal ruling is involved in the turning of that switch within the brain. Because no legal ruling is involved, there was historically no available mechanism for an appellate court to review on the evidence the verdict of a fact-finding judge.

The predecessor provisions to what is now Rule 8–131(c) conferred on appellate courts the authority to rule on the legal sufficiency of evidence in court trials by applying the clear error standard of review. Such appellate review of a verdict on the evidence became available on the civil side in 1941 and on the criminal side in 1950. *Edwards v. State,* 198 Md. 132, 153–54, 83 A.2d 578 (1951). *See also Isen v. Phoenix Assur. Co. of New York,* 259 Md. 564, 270 A.2d 476 (1970); *Williams v. State,* 5 Md.App. 450, 452–59, 247 A.2d 731 (1968). As *Edwards v. State,* 198 Md. at 154–55, 83 A.2d 578 explained:

> *Until adoption of the* federal and *Maryland rules of civil and criminal procedure there was* (perhaps with special exceptions under federal statutes) *no appellate review of facts at all in the* federal or *Maryland courts in civil cases at law or in criminal cases.*

(Emphasis supplied).

The respective civil and criminal enabling rules for the appellate review of evidentiary sufficiency have now coalesced into Rule 8–131(c). With respect to Rule 8–131(c) itself, however, its concern is not with how the evidence arrived at the state it was in at the end of the adjudicatory process. Its concern is rather with whether the evidence at that stage, however it came to be, is sufficient to permit the deliberative process to begin.

■ What the appellant is attempting to do is to apply Rule 8–131(c) to an ancillary non-finding of a fact in the middle of the trial. She claims that had the proper "finding" been made that a confidential relationship existed, a presumption in her favor of undue influence would then have arisen. She then hypothesizes, however, the very existence of the presumption she desired and makes the further claim that the ultimate verdicts were erroneous in the face of such an "unrebutted" presumption. The existence of a confidential relationship was not, of course, an ultimate fact in issue. It was not the subject matter of a verdict. Rule 8–131(c) and its "clear error" analysis simply will not stretch as far as the appellant would stretch it.

## THE APPELLEE'S BEST VERSION OF THE FACTS

Purely for the sake of argument, however, we will indulge the appellant in the assumption that "clear error" analysis applies to the non-finding of a confidential relationship in this case. We do so because of the rare opportunity it affords to explore the heretofore almost totally unexplored subject of how a fact finder could ever be clearly erroneous with respect to what was not found. It is not inappropriate that we do so in this case, moreover, because although Rule 8–131(c) itself

may literally apply only to ultimate verdicts, we do in various contexts apply the "clearly erroneous" criterion to a trial judge's ancillary fact finding on a variety of intermediate issues that can come up for appellate review.

■ As we probe Judge Smith's verdict and, *arguendo*, its antecedent fact finding for clear error, "the prevailing party is entitled to have the evidence viewed in the light most favorable to it." *Goodwin v. Lumbermens Mut. Cas. Co.*, 199 Md. 121, 127–30, 85 A.2d 759 (1952). *See also Burroughs Int'l Co. v. Datronics*, 254 Md. 327, 337, 255 A.2d 341 (1969); *Balt. & Ohio Railroad v. Kuchta*, 76 Md.App. 1, 11, 543 A.2d 371 (1988); and *Levin v. Levin*, 43 Md.App. 380, 386, 405 A.2d 770 (1979). The prevailing party, of course, is the appellee and it is in his direction that our interpretative favor will tilt. *Moosavi v. State*, 118 Md.App. 683, 692–95, 703 A.2d 1302 (1998), *rev'd on other grounds*, 355 Md. 651, 736 A.2d 285 (1999).

The appellant is the 95-year-old mother of the appellee. She is almost totally blind, almost totally deaf, and suffering from diabetes. For approximately twenty years prior to August of 1997, the appellant lived alone in her residence at 4907 Ridgeview Lane in Bowie. On August 26, 1997, however, she was taken to Laurel Regional Hospital because of problems she had been having with her foot, complicated by her diabetes. A few days later, on September 3, the appellee drove to Maryland from his Florida residence to see his mother. During that visit, he had her evaluated for mental competency by a psychiatrist.

Dr. Exall Kimbro, Jr. performed that examination and concluded that the appellant was "alert and competent mentally. There is no psychiatric history." Also in Dr. Kimbro's written report was the following:

> **HISTORY OF PRESENT ILLNESS:** The patient is a 92-year-old white female who was seen in the presence of her son who had requested the evaluation. Apparently he was getting somewhat perturbed with her because of her resistance to his helping with her affairs and her insistence on being completely independent. *Today she told me very*

*pleasantly that this was her only child and that he was helping her with her affairs and that she was giving him power of attorney so that he could handle everything for her. She seemed to be completely happy with that decision.* Her son told me later that he had been talking to her about it and the importance of doing that. *Both of them declared that their relationship was good.*

\* \* \*

*. . . She stated that she wanted her son to handle her affairs and that he would be inheriting everything since he is the only child.*

(Emphasis supplied). On that same date, the appellant was also visited by her attending physician, Dr. Robert DePetris, who noted that she was "fully alert and answering to all questions appropriately."

On September 8, 1997, the appellee visited the appellant at Larkin Chase Nursing Home and brought with him (1) a Power–of–Attorney form and (2) a deed to the appellant's home which transferred her sole ownership to that of joint ownership with him. In a deposition, the appellant recalled signing the Power–of–Attorney but denied that she ever signed the deed. The appellant's signature nonetheless appeared on both documents and both were notarized in her presence. The notary, Marian Buckner, later testified that she did not specifically recall meeting with the appellant and notarizing the documents. Ms. Buckner did testify, however, that "I know that if I notarize a signature, I always make sure that the resident knew what was actually in it, because a lot of residents don't actually understand—I mean, they would sign most anything."

On July 21, 1998, the appellant filed suit against the appellee in the Circuit Court for Prince George's County. Following a series of amended complaints, she sought relief for the following: (1) accounting, (2) breach of fiduciary duty, (3) constructive fraud, (4) constructive trust, (5) quiet title, and (6) fraud. Counts 1 and 2 concerned certain financial conse-

quences of the appellee's actions pursuant to his power of attorney, *i.e.*, the closing of the appellant's bank accounts and the appellee's purchase of the CDs with some of the money that had been his mother's bank account. Counts 3 through 6 concerned the ownership of the property at 4907 Ridgeview Lane and the appellant's disputed signing of the deed to that property.

On September 21, 1999, a court trial was held. At the conclusion of the trial, the court referred counts 1 and 2 to the Court auditor for an accounting before making any decision. The court ruled in favor of the appellee as to counts 3 through 6. We are concerned, therefore, **only** with those counts pertaining to the deed transferring ownership of the appellant's residence.

## THIS TRIAL WAS ABOUT AN ALLEGED FORGERY NOT ABOUT A CONFIDENTIAL RELATIONSHIP

Before turning to the now critical question of whether Judge Smith was clearly erroneous in failing to find the existence of a confidential relationship, it is important to place this entire issue, and our assessment of the trial with respect to this issue, in the context of the actual trial that took place before Judge Smith. The issue now being raised on appeal, if it was before the circuit court at all, was before that court only in the most peripheral of fashions. Indeed, the case before us bears little resemblance to the case that was tried before Judge Smith. We will not, therefore, indulge in a critical inquiry into why Judge Smith did this or why Judge Smith did not do that from the warped perspective of the appellant, who would like us to treat as having been on center stage an issue that was, at best, in the far, far wings of the trial that actually took place.

In attempting to set aside the deed from the appellant to the appellant and the appellee jointly, the primary thrust of the appellant's case at the trial level was that the appellant never signed such a deed and that it was, therefore, a forgery.

The dominant focus of the trial was not on either 1) the existence of a confidential relationship or 2) the abuse of such a relationship. It was almost exclusively on the issue of whether the appellant signed the deed to her home or whether her purported signature was a forgery. The case before Judge Smith consisted of the testimony of four witnesses, the pre-trial deposition of the appellant, and the medical evaluation of the appellant made by Dr. Exall Kimbro.

In her deposition, the appellant never stated that she signed the deed because she succumbed to the pressure, the cajoling, or the blandishments of her son to get her to do so. She adamantly maintained that she did not sign the deed at any time. The medical report from Dr. Kimbro did not suggest in any way that the appellant was under the influence of her son. It characterized her as "alert and competent mentally."

Two of the three witnesses called by the appellant were 1) her long-time friend and neighbor, Kay Kaplanis, and 2) the manager-director of an assisted living facility where the appellant stayed for several months, Dorothy Powell–Allen. Ms. Kaplanis gave a general narration of the appellant's at-times troubled relationship with her son but did not indicate she was under his influence or relied on him in deciding what course of action to take. Her testimony actually reflected overtones of hostility between the appellant and her son. Ms. Powell–Allen shed little light on the relationship between the appellant and her son and what little light she did shed was not indicative of any pressure being placed upon or advantage being taken of the mother by the son:

Q: And you knew Mrs. Starke fairly well as she was a resident at your home?

A: Yes, I think I did.

Q: And did you view her as being disadvantaged, being taken advantage [of] by her son?

A: No, I did not. Not when she got there. I thought he was doing his job as son.

The real battle was joined by the last two witnesses and almost all of Judge Smith's rendering of his verdict was

devoted to resolving the conflict between those two witnesses. Katherine Koppenhaver was offered by the appellant as an expert witness on handwriting examination. She testified that the signature on the deed was not that of the appellant. The appellee then offered Marian F. Buckner, the Notary Public who notarized the deed, as his only witness. Her testimony supported the conclusion that the appellant had signed the deed. In rendering his verdict at the conclusion of the trial, Judge Smith devoted almost all of his analysis to his resolution of the question of whether the appellant's signature on the deed was genuine:

> *... I did hear from the notary public. I find her to be a credible witness. I find her testimony to be consistent and logical, and I believe her testimony as a credible witness.*

> I think that the expert witness, Ms. Koppenhaver, did the best that she could, but document examination is far, far, far from an exact science when one does not have the original documents and is able, for instance, to run scientific tests on paper and ink and things of that nature.

> *I think Ms. Koppenhaver's testimony has been sufficiently placed in doubt. ...*

> *Having found Ms. Koppenhaver's testimony now to be less than persuasive, and Ms. Buckner's testimony to have been persuasive, I am convinced that [the deeds* of October 8 and 9, 1997] *are each genuine documents bearing the signature of Bernice C. Starke* that they purport to bear, and that the signature is not false or forged or copied and that the documents, *each of the documents are genuine.*

(Emphasis supplied).

Those findings of fact were essentially dispositive of the entire case. Having made those findings, Judge Smith proceeded summarily to render his verdicts as to the various counts. Both parties were apparently satisfied that the verdicts resolved all outstanding questions. The appellant never requested any further findings of fact or further verdicts. She never suggested that there were issues of 1) the existence

of a confidential relationship or 2) the abuse of a confidential relationship still calling for resolution.

We are fully persuaded that the contention now being raised by the appellant is no more than, or little more than, an appellate afterthought. At the very least, the rhythm and course of the real trial makes it clear why Judge Smith did not have more to say about either 1) the existence of a confidential relationship or 2) its abuse if it did exist. There was no occasion for him to address those issues that were not squarely before him. The appellant at the time of the rendering of the verdicts, moreover, did not ask him to address those issues.

## HOW DO WE MEASURE CLEAR ERROR WITH RESPECT TO WHAT IS NOT FOUND

The measure of whether evidence is legally sufficient 1) to permit the judge to submit the case to the jury, in a jury trial, or 2) to support the judge's verdict as not clearly erroneous, in a non-jury trial, is the same in civil cases and criminal cases alike. *Isen v. Phoenix Assur. Co. of New York*, 259 Md. 564, 569, 270 A.2d 476 (1970); *Williams v. State*, 5 Md.App. 450, 452–60, 247 A.2d 731 (1968). We use various references to refer to such legal sufficiency. We sometimes speak of the legal sufficiency of the evidence; we sometimes speak of satisfying the burden of production; we sometimes speak of a *prima facie* case.

This civil or criminal burden of production is a constant that does not rise and fall with the shifting of the burden of persuasion. The burden of persuasion is simply an attempt to communicate to lay jurors our historic understanding of the level of certitude, greater or lesser, that they should feel before reaching a decision on a particular kind of issue. How a fact finder, properly instructed, then assesses credibility and how much weight a fact finder gives to evidence, however, are matters within the exclusive control of the fact finder. Evidence that is legally sufficient to persuade one fact finder only by a bare preponderance of the evidence may

persuade a second fact finder clearly and convincingly or yet a third fact finder beyond a reasonable doubt. Our measurement of the legal sufficiency of the evidence has nothing to do with what the burden of persuasion may be. *McCoy v. State,* 118 Md.App. 535, 539, 703 A.2d 237 (1997); *Moosavi v. State,* 118 Md.App. 683, 686–92, 703 A.2d 1302 (1998), *rev'd on other grounds,* 355 Md. 651, 736 A.2d 285 (1999).

The measure of legal sufficiency, moreover, is precisely the same whether we are applying it in the context of a jury trial or a non-jury trial. *Isen v. Phoenix Assur. Co.,* 259 Md. at 571, 270 A.2d 476; *Allen v. Steinberg,* 244 Md. 119, 122–23, 223 A.2d 240 (1966). "Although the manner in which the question of the sufficiency of the evidence comes before us when a case is tried by the lower court without a jury is different than when a case is tried below by a jury, we see no material difference in the tests applied in determining the question." *Williams v. State,* 5 Md.App. at 458, 247 A.2d 731.

■ We do, to be sure, frame the issue somewhat differently, depending upon that context. In a jury trial, our inquiry will be whether the evidence was legally sufficient to permit the judge, as a matter of law, to submit the case to the jury. In a non-jury trial, our inquiry will be whether the evidence was legally sufficient to sustain the verdict of the fact-finding judge as not clearly erroneous. With respect to the difference in the framing of the issues in the respective contexts of jury and non-jury cases, *Williams v. State,* 5 Md.App. at 455–56, 247 A.2d 731, explained:

[T]he issue comes before us in a case tried by the lower court sitting as a jury in a different posture than when the case is tried by a jury. *In a non-jury case* Rule 1086 specifically provides that *we shall review the case upon the evidence* (as well as the law) *and we must determine whether the lower court was clearly wrong on the evidence in finding a verdict* of guilty. *In a jury case if the lower court finds upon motion for judgment of acquittal that the evidence is sufficient in law to justify a conviction,* it denies the motion, and permits the evidence to go to the jury. On

appeal *we determine whether the denial of the motion was proper.* It is because of this difference in the posture of the issue of the sufficiency of the evidence that we may entertain the issue on appeal in a jury case *only* upon the denial by the lower court of a motion for judgment of acquittal but we must entertain the issue in a non-jury case when presented on appeal even in the absence of a motion for judgment of acquittal below.

(Footnotes omitted; emphasis supplied; italicized emphasis in original).

In both cases, however, the measure of that legal sufficiency will be precisely the same. In *Williams v. State,* 5 Md.App. at 458–59, 247 A.2d 731, Judge Orth described the sameness of the measure regardless of the context in which the measurement is applied:

Once the question of the sufficiency of the evidence is properly before us, we believe that *the criteria used to determine the question is the same, be the verdict rendered by the court or a jury. . . .* In other words we do not believe that evidence can be sufficient to permit its submission to the jury unless it is sufficient for the jury to find the defendant guilty beyond a reasonable doubt. . . . We feel that *the apparent difference in the stating of the two tests is one of semantics and not substance.* When an accused elects to be tried before the court without a jury, the court is substituted for the jury and has the same function in passing upon the guilt of the accused.

(Emphasis supplied).

■ Civil trial and criminal trial alike, jury trial and non-jury trial alike, the test for the legal sufficiency of the evidence is precisely the same:

**Is there some evidence in the case, including all inferences that may permissibly be drawn therefrom, that, if believed and if given maximum weight, could logically establish all of the elements necessary to prove that the defendant committed the crime, that the tortfeasor com-**

mitted the tort, that the defendant breached the contract, etc.

*Edwards v. State,* 198 Md. at 157–58, 83 A.2d 578, framed the test for the legal sufficiency of the evidence, without which a verdict would be clearly erroneous, in essentially the same language:

> In any case, civil or criminal, to meet the test of legal sufficiency, evidence (if believed) must either show directly, or support a rational inference of, the fact to be proved.

*And see Moosavi v. State,* 118 Md.App. at 692–97, 703 A.2d 1302.

In a jury case and a non-jury case alike, the legal sufficiency *vel non* of the evidence will lead to precisely the same results, notwithstanding the difference in the framing of the issues. Once more, it was the pioneering analysis of Judge Orth in *Williams v. State,* 5 Md.App. at 460, 247 A.2d 731, that articulately set out the rules:

> If there was such [legally sufficient] evidence, the lower court would neither be clearly erroneous, in a trial without a jury, in finding a verdict ..., nor in error, in a jury trial, in denying a motion for judgment ... And if there was no such evidence, the lower court would be clearly erroneous, in a trial without a jury, in finding a verdict ..., and in error, in a jury trial, in denying a motion for judgment ... Whether the lower court was clearly erroneous in its judgment on the evidence in a non-jury case or erred in allowing the evidence to go to the jury in a jury case, we would be obliged to set aside the judgment when the question was properly before us.

(Footnote omitted).

Our immediate problem in this case (the thing that makes it fascinating) is that almost all, if not indeed all, of the case law discussing the legal sufficiency of evidence is from the perspective of the satisfaction of the burden of production by the proponent of a proposition. The invariable inquiry is whether there was some competent evidence to establish all of the elements needing to be established to justify submitting the

case to the jury or to sustain a judge's verdict as not-clearly erroneous.

The appellant, with no case law to guide us, is asking us to look at the diametric opposite of what is invariably measured. The inquiry in this case is not the familiar question of whether the evidence was **minimally** sufficient to **permit** a verdict, but the starkly different question of whether it was so **maximally** overwhelming as not even to **permit a doubt.**

## THE NON FINDING OF A CONFIDENTIAL RELATIONSHIP

In contending that Judge Smith was clearly erroneous in **finding** that there **was no** confidential relationship between the son and the mother, the appellant is re-casting to her advantage what actually happened. Judge Smith never made a finding in that regard, one way or the other, nor was he required to do so. The appellant's contention, more accurately stated, really should be that Judge Smith was clearly erroneous in **failing to find** that there **was** a confidential relationship. There is a subtle, but sometimes critical, difference between 1) **not being persuaded** that **a relationship does exist** and 2) **being persuaded** that **a relationship does not exist.** It is the difference between the mere non-finding of an affirmative and the actual finding of a negative. It is only the former that concerns us in this case.

It makes a difference, of course, because it is far easier to sustain as not clearly erroneous the decisional phenomenon of not being persuaded than it is to sustain the very different decisional phenomenon of being persuaded. Actually to be persuaded of something requires a requisite degree of certainty on the part of the fact finder (the use of a particular burden of persuasion) based on legally adequate evidentiary support (the satisfaction of a particular burden of production by the proponent). There are with reasonable frequency reversible errors in those regards. Mere non-persuasion, on the other hand, requires nothing but a state of honest doubt. It is virtually, albeit perhaps not totally, impossible to find revers-

ible error in that regard. Posing the question in this case in terms of **non-persuasion,** incidentally, casts Judge Smith's arguable silence on the issue in a more favorable light.

Our analysis begins with the recognition that the non-finding of a given proposition by no means necessarily implies the finding of its opposite, despite a common tendency to think that it does. This is the recurring semantic fallacy of the false affirmative.[1] Had the appellant, pursuant to that semantic fallacy, posed the bi-polar question: "Which do you find, Judge, Proposition A (the existence of a confidential relationship) or Proposition B (the non-existence of a confidential relationship)?" Judge Smith could, with complete propriety, have responded, "I find neither. I am not persuaded of anything and, therefore, the *status quo,* whatever it may be, continues undisturbed."

The *status quo,* in a case such as this, is that there is no confidential relationship between the parent and the child. It was the appellant who asserted the existence of such a relationship in this case and who, as proponent, bore the burden of proving it. As Judge Hammond pointed out for the Court of Appeals in *Akin v. Evans,* 221 Md. 125, 130, 156 A.2d 219 (1959):

> *We think the evidence* of confidential relationship *inconclusive. No presumption of such a relationship arises* in the case of a gift from a parent to a child. *The burden of proof is on the party alleging the relationship to prove it.*

(Emphasis supplied).

Judge Digges wrote to the same effect in *Treffinger v. Sterling,* 269 Md. 356, 361, 305 A.2d 829 (1973):

---

1. In homicide law, for instance, the non-finding of malice by no means implies the finding of non-malice. Again in homicide law, the non-finding of premeditation by no means implies the finding of non-premeditation. In burglary law, the non-finding of nighttime by no means implies the finding of non-nighttime. In attempt law, the non-finding of consummation by no means implies the finding of non-consummation. In automobile theft law, the non-finding of permanent intent to deprive by no means implies the finding of non-permanent intent. *In re Lakeysha P.,* 106 Md.App. 401, 433–47, 665 A.2d 264 (1995).

It is also clearly established that undue influence may arise from the breach of a confidential relationship existing between a grantor and his grantee. But, *there is no presumption of such a relationship in the case of a transfer from a parent to a child and the burden of demonstrating that one exists is on the party alleging it.*

(Emphasis supplied).

■ Where the appellant, as here, failed to persuade Judge Smith that a confidential relationship between the son and the mother existed, the law with respect to a gift from a parent to a child tilted decidedly in the appellee's favor. In *Williams v. Robinson*, 183 Md. 117, 120, 36 A.2d 547 (1944), Judge Delaplaine explained:

[I]t is well settled that *no presumption of fraud arises when a gift is made by parent to child, if the parent is mentally competent and understands the effect of his act, and therefore the burden of proof is on the person seeking to invalidate the gift. Henry v. Leech*, 123 Md. 436, 91 A. 694. It is definitely held in Maryland that when a competent person, in pursuance of a long cherished purpose, makes a voluntary gift to a favorite relative, whom he has raised from childhood and with whom he has lived on intimate and affectionate terms, *there is no presumption that the donee exerted undue influence, and the court should not set such a deed aside except upon strong and conclusive proof.*

(Emphasis supplied). *See also Henry v. Leech*, 123 Md. 436, 91 A. 694 (1914).

Had the appellant, on the other hand, succeeded in persuading Judge Smith that a confidential relationship did, indeed, exist, then the law with respect to the gift would have tilted in the appellant's favor. *Williams v. Robinson*, 183 Md. at 120, 36 A.2d 547, further explained:

[W]here the child acts as a guardian for the parent, ... *if there is an improvident gift from the parent to the child the court presumes that it was obtained by fraud, and will hold the conveyance void, unless the child shows such facts as*

*will satisfy the court* that he understood the effect of his act and there was no imposition.

(Emphasis supplied).

In this case, the appellant failed to carry her burden of persuading Judge Smith that a confidential relationship existed between her and her son. The tilt, therefore, remained where it had always been, in the appellee's favor. To have changed that *status quo,* the appellant would have to have carried successfully her burden of persuasion and she did not do so. To maintain the *status quo* in his favor, on the other hand, the appellee did not have to do anything. He could passively rely simply on the appellant's failure to carry her burden. He had no independent burden of his own.

## A VERDICT MAY NOT BE "DIRECTED" IN FAVOR OF A DISPUTED PROPOSITION

What is before us ultimately distills down into a single issue. It is an issue which, to the best of our knowledge, is one of first impression. On appellate review of the evidence, how could we ever hold, in a non-jury case, that a judge was clearly erroneous for not being persuaded of something.

■■■■ Resolving disputed credibility and weighing disputed evidence are matters, of course, in the unfettered control of the fact finder. Where either the credibility of a witness or the weight of the evidence is in dispute, therefore, there is no way in which a fact finder, with such matters properly before him, could ever be clearly erroneous for not being persuaded. By analogy to the jury trial, it is only in those situations where the judge, as a matter of law, has erroneously submitted an issue to the jury in the first place that a finding of fact with respect to that issue could ever be deemed clearly erroneous. With rare exceptions, the judge can only be wrong in submitting an issue to the jury where the proponent has failed to carry his burden of production. That, of course, is not what is before us in this case.

The only analogue on which the appellant might hang her argument would seem be to the rare and extraordinary cir-

cumstance where a judge would be required, in effect, to "direct a verdict" in favor of the proponent of a proposition and could not even allow the jury to entertain a doubt as to the existence of such a proposition. The judge in such a case is "directing" the fact finder that it must be persuaded. We now recognize, of course, that the judge is actually taking the case away from the fact finder.

It is not unusual for a judge to take a case away from the fact finder where the proponent has failed to carry a burden of production. It is a far, far rarer phenomenon, however, to take a case away from the fact finder because the proponent's proof is so overwhelming and decisive that the fact finder will not even be permitted to doubt it. Although we know of no instance where such a legal principle has ever been extended to the fact finding of a judge in a non-jury case, it behooves us nonetheless to look at the small body of case law applying such a principle to a judge in his capacity as legal referee. When must a verdict be "directed" in favor of a proponent?

*Smith v. Miller,* 71 Md.App. 273, 525 A.2d 245 (1987), was a case where it was the party bearing the burden of proof on an issue who claimed entitlement to a verdict in his favor as a matter of law. In rejecting that argument, Judge Bell (now Chief Judge of the Court of Appeals) pointed out for this Court, 71 Md.App. at 278–79, 525 A.2d 245, the stringent limitations on such an entitlement:

> [W]here a motion for judgment and subsequent motion for judgment n.o.v. are filed by a party who bears the burden of proof on the issue, the court may only grant either motion when
>
> > the facts are *uncontroverted* (as opposed to merely *uncontradicted* ) or the parties have agreed as to the facts and such facts and the circumstances surrounding them permit of only one inference with regard to any issue presented by the motion. *See, Alexander v. Tingle,* 181 Md. 464, 30 A.2d 737 and *Pennsylvania R. Co. v. Stallings,* 165 Md. 615, 170 A. 163. In the latter case, at 619 [170 A. 163], the Court said:

" . . . . Nor is it true that the court can say as a matter of law that one upon whom the burden rests has discharged that burden merely because testimony offered by him was not contradicted. To so hold would be to override the decisions in a long line of cases that the jury has the right to disbelieve a witness even when uncontradicted. [citing cases] In *Harrison v. Central Construction Co.*, 135 Md. 170, at page 180, 108 A. 874, 878, it was said: 'When the facts have been ascertained and agreed upon by the parties, or are undisputed, and there is no dispute as to the inferences to be drawn from the facts, the question becomes one of law and may be decided by the court.'

"This was said in a case where there was an agreed statement of facts. And it will be found, on examination of all the cases where like language is used there was no controversy about the facts. [citations omitted]. 'Undisputed,' as used in these cases, must be taken to mean 'uncontested,' rather than 'uncontradicted.' "

(Emphasis in original). *See also Thodos v. Bland,* 75 Md.App. 700, 714–15, 542 A.2d 1307 (1988).

*Talley v. Dept. of Correction,* 230 Md. 22, 185 A.2d 352 (1962), was also a case where the proponent of a proposition argued on appeal that he was entitled to a directed verdict in his favor. In holding against him, the Court of Appeals, 230 Md. at 28–29, 185 A.2d 352, explained the severe limitations on such an entitlement:

[W]here the facts are conceded, undisputed, or uncontroverted, and the inferences to be drawn therefrom are plain, definite and undisputed . . . their legal significance is a matter of law to be determined by the court, but *where the facts, or inferences therefrom, or both, are in dispute, such questions are to be determined by a jury (or where the case is submitted to the court, by the judge as questions of fact, not of law), and the jury (or the court sitting to determine questions of fact)* is entitled to weigh and evaluate the

evidence, and *may disbelieve evidence, even though it is "uncontradicted."*

(Footnotes omitted; emphasis supplied).

In *Peroti v. Williams,* 258 Md. 663, 267 A.2d 114 (1970), Judge Digges made it clear that in order for an issue of fact to qualify as "uncontroverted" or "undisputed," there must be actual or constructive acquiescence in the truth of that fact on the part of all parties:

> Appellant Peroti contends that she was ... entitled to a directed verdict, and so we must examine what standard of proof is necessary to achieve this result. In *Dunstan v. Bethlehem Steel Co.,* 187 Md. 571, 578, 51 A.2d 288 (1947) the Court there distinguished "between (a) uncontradicted evidence which a jury might disbelieve and (b) uncontroverted or undisputed facts, which present only a question of law." Only in the second case is the court justified in removing an issue from the jury's consideration. *Our understanding is that for evidentiary facts and inferences to be "uncontroverted or undisputed" there must be either actual or constructive acquiescence in their truth on the part of all affected parties.*

258 Md. at 669, 267 A.2d 114 (emphasis supplied).

## THE EVIDENCE OF A CONFIDENTIAL RELATIONSHIP WAS NEITHER UNDISPUTED NOR UNCONTROVERTED

 The appellee has by no means conceded or acquiesced in the establishment of a confidential relationship between him and his mother. He has most vigorously argued that there was no such relationship. In *Treffinger v. Sterling,* 269 Md. 356, 361, 305 A.2d 829 (1973), the Court of Appeals set out a number of factors to be considered in determining the existence of a confidential relationship between an aging parent and a child:

> Among the factors to be examined in determining whether this relationship has come into being are the parent's advanced age, his physical debility, his mental feebleness, and

his dependence on his child. None of these factors is necessarily conclusive and each should be given that weight which is warranted by the circumstances then present.

In looking at the *Treffinger* factors alone, and certainly at the range of inferences that might be drawn from them, it is clear that there was a genuine factual dispute with respect to the existence of a confidential relationship. The first two factors—the appellant's advanced age and the appellant's physical debility—clearly tilted in favor of the existence of such a relationship. The third factor—the mental acuity of the appellant—leaned decidedly, on the other hand, in the opposite direction. The critical evaluation of Dr. Kimbro with respect to the appellant's mental competence was that she was by no means mentally feeble:

> The patient appeared alert and competent mentally. There is no psychiatric history. She enjoyed relating and was quite appropriate socially.

The fourth *Treffinger* factor, just as was the third, was counter-indicative of a confidential relationship between mother and son. Taking that version of the facts, and all inferences reasonably deducible therefrom, most favorable to the appellee, the evidence did not show a strong dependence by the appellant on her son. It is frequently the situation where confidential relationships are found between an ageing parent and a child that the child is living with and caring for the parent on a daily basis. The son in this case lived in Florida and, but for an emergency trip because of the parent's serious illness, only visited his mother approximately once a year. To the mother's chagrin, even those visits were lamentably short.

To the extent the appellant relied on anyone, it was on her friend and neighbor Kay Kaplanis. Ms. Kaplanis had a key to the appellant's home. She assisted the appellant with her banking. She was also regularly relied on by the appellant for transportation, for shopping, and for taking care of home maintenance problems.

Various bits of testimony indicated that there was actually periodic friction between the appellant and her son. She told

her attending physician on September 3, 1997, that she did not wish to sign "any papers to her son." She was reluctant even to have him summoned north to Baltimore at the time of her hospitalization, because of her belief that her condition was "not that serious." Several of the witnesses testified to her fierce desire to maintain her independence.

In a typical ageing parent-child confidential relationship, it frequently eventuates that the nurturing child receives a benefit from the "dependent" parent inordinate to the benefits received by siblings and other close family members. In this case, the deed from the mother to herself and her son jointly did not partake of any unnatural or unequal largesse. The appellant had indicated to Dr. Kimbro that her son was her only heir and she fully expected him to inherit everything upon her death.

 Applying the *Treffinger* factors alone, the evidence, at least arguably, cut both ways. It was clearly, therefore, grist for the fact-finding mill. Whatever the fact finder does in such circumstances is, by definition, not clearly erroneous.

## CONCLUSION

The existence of a confidential relationship between mother and son was most definitely controverted by the appellee in this case. The proponent for the existence of such a relationship was the appellant. Hypothetically, had the existence of such a relationship been the ultimate issue in a jury case, it would not have been an appropriate occasion for a judge, as legal referee, to have taken the case away from the jury and, in effect, to have "directed a verdict" in favor of the proponent. Under such circumstances and even assuming, purely *arguendo*, the appellate reviewability of a **non-finding** of an ancillary fact for clear error, it is not even arguable that the fact-finding judge in this non-jury case was clearly erroneous when he was **not persuaded** of the existence of such a relationship.

The intermediate finding of such a relationship was the indispensable fulcrum by which all three of the appellant's

literal contentions were to be lifted. Without that fulcrum, there is no leverage for the arguments that Judge Smith 1) erroneously failed to find constructive fraud, 2) erroneously failed to impose a constructive trust on the jointly held property, and 3) erroneously failed to quiet title to the property. They don't get off the ground.

*JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.*